Filed 8/3/26

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Conservatorship of the Person of C.O. _____ PUBLIC GUARDIAN OF SONOMA COUNTY, as Conservator, etc.,     Petitioner and Respondent,     v. C.O.,     Objector and Appellant. | A174646 (Sonoma County Super. Ct. No. 25PR00728) |

Defendant C.O.[1] appeals the judgment following a court trial imposing a one-year conservatorship under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5000 et seq.).[2]  C.O. contends that the trial court erred by failing to advise her that she had a right to a jury trial and that she did not validly waive that right.  C.O. also contends there was insufficient evidence in support of the court's grave disability finding and its order imposing special disabilities denying her the right to refuse medication

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II, III, and IV.

[1] We refer to appellant by her initials to protect her privacy interests. (Cal. Rules of Court, rule 8.90(b)(2).)

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

related to her grave disability, to possess a firearm, and to operate a motor vehicle.  She also argues that the court abused its discretion by placing her in locked facility.  We affirm.

## BACKGROUND[3]

In 2022, C.O. was involuntarily committed and subject to a series of temporary detentions for evaluation and treatment.  (See §§ 5150, subd. (a), 5250, 5270.15.)  At the end of 2023, the Public Guardian was reappointed as C.O.'s conservator through December 2024.  (See § 5361.)  In 2024, the Public Guardian again petitioned for reappointment as conservator of C.O.  Following a court trial, the trial court granted the Public Guardian's petition and extended C.O.'s commitment one year until December 2025.  This court reversed the trial court's order due to evidentiary deficiencies in the hearing on the 2024 conservatorship petition.

After the 2024 order reestablishing C.O.'s conservatorship was reversed, the Public Guardian filed an ex parte petition seeking appointment as temporary and permanent conservator for C.O.  The petition alleged that C.O. was gravely disabled because she was "unable to provide for her basic personal needs for food, clothing, or shelter as a result of a mental disorder, and [was] incapable of accepting treatment voluntarily."  C.O. was personally served with a citation for conservatorship, which stated, "You have the right to a jury trial if you wish."

In support of the petition, Dr. Talvinder Rana stated that "[C.O. was] well known to [him] since 2023" and that he had examined C.O. a week prior

---

[3] The procedural background of C.O.'s past commitments has been set forth in our previous unpublished opinion *Conservatorship of the Person of C.O.* (May 5, 2025, A172178) [nonpub. opn.] 2025 Cal.App. LEXIS 2740, which we incorporate by reference.  We recite only those facts necessary for context and to resolve the issues presented in this appeal.

2

to the petition's filing. Dr. Rana related that C.O. had an extensive psychiatric history of schizoaffective disorder bipolar type, post-traumatic stress disorder, and substance use. Dr. Rana also noted that C.O was pregnant but had "report[ed] [the fetus was] [a] rat inside her belly," "refus[ed] to comply with prenatal care," and tried to leave a court hearing and a prenatal check without permission. Dr. Rana opined that C.O. "remains incapable to provide a viable plan for her food, clothing and shelter and out patient pregnancy care with psychiatric treatment," concluding that "[C.O.] remains gravely disabled due to psychotic symptoms needing [continued] supervised and supportive mental health care." Dr. Rana also declared that C.O. lacked the capacity to consent to treatment with psychotropic medications, to knowingly make rational decisions about her need for treatment, or to rationally handle a deadly weapon or operate a motor vehicle.

The trial court granted the temporary conservatorship of C.O., pending a final determination for the appointment of a permanent conservator. The court ordered that a locked facility was the least restrictive placement for C.O. and imposed legal disabilities on C.O.'s right to drive, handle a deadly weapon, or refuse medical treatment related to her grave disability.

A hearing to set the matter for trial was held in July 2025 (the July hearing). C.O. was present at the July hearing, and C.O.'s counsel (the public defender) stated that C.O. was "requesting a court trial and then we discussed doing that in about 60 days." The public defender then asked C.O., "Is [that] what you still want to do?" C.O. replied, "I am not quite sure. I think I was going to ask you a question. If you think it's necessary to wait 60, try to see how I do at the board and care, maybe I get off at the next court date that we're doing." The trial court interjected to explain that "having the

3

extra time" would help it make the right decision.  The public defender agreed, explaining to C.O. that she would be "changing placement tomorrow" and "we want to see how you do there and the judge wants to hear."  C.O. said she was worried about being placed far from Santa Rosa but she "[did not] mind waiting for 60 days."

Then the following colloquy took place on the record:

"[Public Defender]:  Maybe we can go 45 to 60. · Maybe we can do what we spoke. · We discussed your rights to have a jury or judge trial.

"[C.O.]: · Uh-huh.

"[Public Defender]:  Was it your wish to have a judge trial?

"[C.O.]: · Yes, sir."

The Public Guardian's counsel and the public defender determined a workable trial date, to which C.O. stated, "[s]ounds good to me."  The clerk of the court confirmed the trial date, and the hearing ended shortly thereafter.

At the ensuing court trial on the petition for permanent conservatorship, the Public Guardian called Dr. Gary Bravo as a witness. C.O. stipulated that Dr. Bravo was a board-certified psychiatrist.  Dr. Bravo testified that he had known C.O. in a professional capacity for three years but had not spoken to her recently.  He explained that their last "conversation" took place on May 1, 2024—nearly 17 months earlier—because she refused to meet with him "the last couple times."  To prepare for the hearing, Dr. Bravo reviewed C.O.'s recent medical records and spoke to members of C.O.'s treatment team.

Dr. Bravo relayed that C.O. has two mental health diagnoses— schizoaffective bipolar type and post-traumatic stress disorder—and that C.O. lacks any insight into her mental illness.  He testified that her mental illness causes her to be "very psychotic," "to hallucinate," and to "act[] in very

4

bizarre and irrational ways." He expounded that C.O. "[p]uts herself in dangerous situations, gets very paranoid, and delusional." He also said that "she has a[n] anti-authoritarian streak" that "isn't necessarily because of the diagnosis" but which "makes it harder for her to be in controlled situation."

Dr. Bravo further testified that C.O.'s symptoms from her mental illness affect her ability to provide for her own basic needs. He pointed to C.O.'s history of being "off and on conservatorship" and being "brought back because of her symptoms." He also testified that "[s]he has no real plan" to take care of herself outside of the conservatorship, although he acknowledged that "[a]ccording to the notes, she says she has a plan." Even with the support structure of the conservatorship, Dr. Bravo stated that C.O. "runs away . . . or breaks the rules and gets evicted from settings." He then related that C.O. did well at a board and care placement but left without permission several times, resulting in her placement at another facility. She was subsequently placed at an independent living program (Arrowood) and "[d]isappeared for two days" before returning and "refused to follow the rules." Because Arrowood "could not manage her," C.O. was placed in a psychiatric hospital. Due to her history of running away and rule-breaking, Dr. Bravo opined that the least restrictive placement for C.O was a locked facility.

Dr. Bravo also opined that C.O. would not be compliant with her psychotropic medications if she was not in a controlled setting. He based his opinion on C.O.'s statements—to him and captured in notes by her treatment team—that she did not think she has a psychiatric diagnosis nor needs psychotropic medications. However, Dr. Bravo was not aware of any information that C.O. was not medically compliant during her placement at Arrowood. Nonetheless, Dr. Bravo believed that C.O. should be denied the

right to refuse to consent to treatment related to her grave disability. He further opined that C.O should be disabled from operating a motor vehicle or firearm because her mental illness affected her ability to exercise reasonable control over those instrumentalities.

C.O. testified after Dr. Bravo. She said that she left Arrowood "because [the staff] . . . told [her] to," but she continued to say that "[she] left in the middle of the night to get cigarettes because [she] couldn't . . . sleep." She explained that she "was trying to stay up" to protect herself "because people have been preying on [her] in [her] . . . sleep." On redirect, C.O. affirmed that she was absent from Arrowood for two days because the staff told her that she could not return after she left. C.O. further stated: "I wanted to go see if my mom was like still out there somewhere like in heaven, or something. . . . I brought somebody some money. I don't know who it was, but I gave like $200."

When asked where she would live if released, C.O. replied that she would stay at one of two homeless shelters, buy a car to sleep in, or go to housing assistance program where one can "drop in, and they give you and apartment, they get you a hotel, or go to [a shelter]." If she could not get assisted housing, C.O. said that she would "need to go ask [her] uncle for money" because she is the "heir" of a family business, yet she had not received any of the checks that "[h]e said he's been sending." She was unsure if the government or her family was stealing her money. She later confirmed that she had not contacted the housing assistance program because she lost the phone number. She maintained that she could live "on the streets."

C.O. said that she does not have CalFresh because someone hacked her account and stolen her food stamps. She also lost her purse with her identification and social security card and did not know how she would

6

recover her social security card. C.O. initially testified that she receives $292 a month in social security income. But after clarifying that she was asked about social security income and not food stamps, C.O. said she receives $1200 a month in social security income. She later said her family was trying to steal her social security checks.

When asked if she believed she needs to take her prescribed medication, C.O. responded: "You know, sometimes I do at this point. No, I don't think I need meds because I don't know what's in them. I don't know how they work. Maybe if I read about them and if they are actually telling the truth about what's in the meds. But I went off meds for a couple days and I was just fine. I was out at the transit and I walked around. I got some exercise, like I was buying like food. I gave people money. Like I don't -- I paid people back. Like I don't see what the problem is unless you guys are trying to keep me in a shelter to keep me away from myself." When asked if she would continue to take her medication, C.O. said that she "probably would because sometimes it helps [her] to calm down." But she averred that she "[does] not have time" to be in a conservatorship.

The court pressed whether C.O. would take medications if she had a choice. C.O. reaffirmed that she "probably would take them because sometimes it helps" with her focus and waking up. Yet she also expressed uncertainty whether her medications were "actually" helping her. She continued: "I haven't studied these medications. I haven't broken them down. I don't know if they're actually the meds that I'm taking that they say that I'm taking. But I don't know."

After closing arguments, the trial court characterized its ruling as "a difficult call," explaining that if C.O. had "follow[ed] the rules" at Arrowood for a sufficient period then she "would be let off conservatorship" but not

7

"[e]nough time . . . elapsed." The court found based on the evidence that C.O. was gravely disabled. The court also imposed special disabilities to deny C.O. the right to refuse medical treatment as it related to her grave disability, and denied her the ability to obtain a driver's license or possess a firearm  The court determined the least restrictive placement to be a locked facility, but expressed hope that C.O. could move into a board and care once she could "act in manner that would allow her to live in that setting."

The trial court finally noted that C.O. acted impulsively "multiple times throughout the hearing."[4] The court also expressed that it had "questions about whether [C.O.] would continue to take medications" even though she said she would.

## DISCUSSION

### I.

### Advisement and Waiver of Right to Jury Trial

C.O. contends that she did not knowingly and intelligently waive her right to a trial by jury. She argues that the trial court was required, and failed, to obtain her personal waiver before proceeding with a court trial, and in any event her counsel did not waive her jury trial right. C.O. further contends that the trial court erred by failing to advise C.O. of her jury trial right.

We disagree that LPS proceedings require a proposed conservatee's personal waiver of the right to a trial by jury, and we find that C.O. knowingly, intelligently, and voluntarily waived her jury trial right through

---

[4] As the trial court announced its ruling, C.O. asserted that the court will go to jail if she was not released, blurted out expletives, and left the courtroom before the proceeding was complete. The transcript also documents a few outbursts by C.O. during Dr. Bravo's testimony.

8

the public defender.  We agree that the trial court erred by failing to advise C.O. of her right to a jury trial, but we find the error harmless.

## A.    Governing Law and Standard of Review

We review de novo a claim that the trial court violated statutory rights by failing to advise a proposed conservatee of his or her right to a jury trial and by failing to obtain a valid waiver of that right.  (*Conservatorship of C.O.* (2021) 71 Cal.App.5th 894, 904 (*C.O.*).)[5]  We review for substantial evidence the court's implied finding that a waiver was knowing, intelligent, and voluntary.  (*Id.* at pp. 918–919.)

The LPS Act authorizes one-year conservatorships for those who are gravely disabled due to a mental health disorder.  (§ 5350.)  Conservatorship proceedings under the LPS Act are civil, not criminal, in nature. (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 537.)  Nonetheless, LPS proceedings threaten significant individual liberty interests.  (*Id.* at p. 540.) "Accordingly, the Legislature and [the courts] have built several layers of important safeguards into conservatorship procedure."  (*Ibid.*)

"Section 5350 addresses the procedure for establishing an LPS conservatorship.  It states in relevant part:  'The procedure for establishing, administering, and terminating a conservatorship under this chapter shall be the same as that provided in Division 4 (commencing with Section 1400) of the Probate Code, except as follows:  [¶] . . . [¶] (d)(1) The person for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue of whether he or she is gravely disabled.  Demand for court or jury trial shall be made within five days following the hearing on the conservatorship petition.  If the proposed conservatee demands a court or

---

[5] Although the conservatee in *C.O.*, *supra*, 71 Cal.App.5th 894 shares the same initials as the conservatee here, the cases are unrelated.

9

jury trial before the date of the hearing as provided for in Section 5365, the demand shall constitute a waiver of the hearing.  [¶] (2) Court or jury trial shall commence within 10 days of the date of the demand. . . . [¶] (3) This right shall also apply in subsequent proceedings to reestablish conservatorship.'  (§ 5350.)

"Division 4 of the Probate Code—incorporated by reference into section 5350—includes Probate Code section 1828.  That statute provides in relevant part 'before the establishment of a conservatorship of the person or estate, or both, the court shall inform the proposed conservatee of . . . [¶] . . . [¶] . . . the right . . . to have the matter of the establishment of the conservatorship tried by jury.'  (Prob. Code, § 1828, subd. (a)(6)).)"  (*C.O., supra*, 71 Cal.App.5th at pp. 904–905.)

## B.    A Proposed Conservatee's Counsel May Waive Jury Trial Right

At the threshold, we must first determine whether a proposed conservatee can waive his or her right to a jury trial through counsel.  We conclude that such a waiver communicated through counsel is permitted under the LPS Act.

"[T]he right to a jury trial on a conservatorship petition exists only as provided by statute.  [Citation.]  Since conservatorship proceedings were unknown to the common law at the time the California Constitution was adopted, there is no constitutional right to such a jury trial." (*Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 271 (*Mary K.*).) "When a statutory right in a civil commitment scheme is at issue, the proposed conservatee may waive the right through counsel if no statutory prohibition exists."  (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 148 (*John L.*) [holding neither the LPS Act nor constitutional due process barred a proposed conservatee's reliance on counsel to waive the right to attend an LPS conservatorship court trial].)

10

Neither the LPS Act nor the Probate Code prohibits a proposed conservatee from relying on counsel to waive the right to a jury trial. (See *C.O.*, *supra*, 71 Cal.App.5th at p. 910; *Conservatorship of B.C.* (2016) 6 Cal.App.5th 1028, 1035.) The relevant statutes do not reference waiver with respect to the right to jury trial, and C.O. does not argue otherwise. (See generally § 5350; Prob. Code, § 1828.) Indeed, trial by jury is not the default mechanism for establishing a conservatorship under the LPS Act. (*C.O.,* at p. 912.) Rather, "the court shall inform the proposed conservatee" of the right "to have the matter of the establishment of the conservatorship tried by jury" (Prob. Code, § 1828, subd. (a)(6)), and a proposed conservatee "shall have *the right to demand* a court *or* jury trial on the issue of whether the person is gravely disabled." (§ 5350, subd. (d)(1), italics added; see also Prob. Code § 1827 ["The court shall hear and determine the matter of the establishment of the conservatorship according to the law and procedure relating to the trial of civil actions, *including trial by jury if demanded by the proposed conservatee*" (italics added)].) Because the right to demand a jury trial in an LPS proceeding is a statutory right and no statute prohibits counsel from waiving the right, a personal waiver from the proposed conservatee is not required.

We respectfully disagree with *Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378, 383 (*Heather W.*), which held that "LPS commitment proceedings require the court to obtain a personal waiver of the right to a jury trial from the proposed conservatee." *Heather W.* analogized LPS proceedings to proceedings for offenders with mental health disorders (OHMD)[6] and hospital commitments for defendants who plead not guilty by

---

[6] Before January 1, 2020, offenders with mental health disorders were referred to as mentally disordered offenders or MDOs. (See *People v. Cannon*

11

reason of insanity (NGI).  (*Ibid.*)  *Heather W.* therefore relied on *People v. Blackburn* (2015) 61 Cal.4th 1113 and *People v. Tran* (2015) 61 Cal.4th 1160, in which the California Supreme Court held that the trial court must elicit a jury waiver decision from the defendant on the record in OHMD proceedings and NGI commitment proceedings, respectively.  (*Heather W.*, at pp. 383–385.)  *Heather W.* noted that "*Mary K.* was decided before *Blackburn* and *Tran*."  (*Heather W.*, at p. 384.)  But as our brethren in the Sixth District observed, "[t]he statutory schemes examined in [*Blackburn* and *Tran*] included express waiver provisions, which the [California Supreme Court] repeatedly emphasized in both decisions."  (*C.O.*, *supra*, 71 Cal.App.5th at p. 911; see Pen. Code, § 2972, subd. (a) ["The trial shall be by jury unless waived by both the person and the district attorney"]; Pen. Code, § 1026.5 [same].)  The plain language of the statues makes all the difference in the context of civil commitment schemes.  (*John L.*, *supra*, 48 Cal.4th at p. 148.)

The facts here are similar to those in *C.O.*, *supra*, 71 Cal.App.5th 894. There, the trial court failed to advise the conservatee on the record of his jury trial right or elicit a personal waiver from him.  (*Id.* at p. 902.)  But "[i]t [was] undisputed that [the conservatee's] attorney had consulted with him about his trial rights, and [the conservatee] had elected a court trial.  It [was] also undisputed that [the conservatee] was present in court when his attorney informed the court that [the conservatee] wished to proceed by court trial, and [the conservatee] participated fully in the trial without objection, including as a witness."  (*Id.* at p. 908.)  Because there was no evidence in the record that the proposed conservatee was unaware of his right to trial by jury or that the conservatee's counsel waived his client's right over his client's

(2025) 18 Cal.5th 497, 509, fn. 2 (*Cannon*).)  In accordance with this change, we conform quotes to the updated terminology.

objection, the Court of Appeal concluded that the trial court did not violate the conservatee's statutory rights when it accepted his counsel's representation that his client waived his rights. (*Id.* at p. 913.) Similarly, in *Mary K.* the Fifth District Court of Appeal held that counsel may waive a proposed conservatee's right to jury trial where "counsel stated he had spoken with his client and she wished to waive a jury trial." (*Mary K.*, *supra*, 234 Cal.App.3d at p. 271; see also *id.* at p. 272 [absent evidence counsel was incompetent, counsel could "waive [client's] advisement of rights without indicating that he had discussed such a waiver with [client]"].)

In view of the relevant statutory language, we find *C.O.* and *Mary K.* to be better reasoned. We further observe that *John L.* approvingly cited *Mary K.*, *supra*, 234 Cal.App.3d at pages 269–271 for the proposition that "even though certain rights implicated in civil proceedings are substantial, they may be waived by an attorney with the client's express consent." (*John L.*, *supra*, 48 Cal.4th at p. 156.) More recently (and following *Blackburn* and *Tran*), our Supreme Court held that civilly committed convicted sex offenders under the Sexually Violent Predator Act do not have a separate fundamental equal protection right or interest in a particular advisement and waiver procedure. (*Cannon*, *supra*, 18 Cal.5th at pp. 521–524.) The court explained that, in the civil context, "the client's choice to demand or waive a jury in all matters has long been expected to be made *in consultation* with legal counsel, and particularly in civil matters, the decision is traditionally communicated to the court *through the attorney*." (*Id.* at p. 523.) The court further cited the LPS Act to demonstrate that the Legislature has chosen not to incorporate the jury advisement and personal waiver provisions found in the NGI and OHMD statutes uniformly across civil commitment schemes. (*Ibid.*)

13

This case law refutes C.O.'s contention that a valid waiver in LPS proceedings requires a " 'robust oral colloquy' " advising the proposed conservatee "about the mechanics of a jury trial." C.O.'s argument is inaptly premised on authority concerning criminal and OHMD proceedings. (E.g., *People v. Sivongxxay* (2017) 3 Cal.5th 151, 167–170 [listing recommended advisements for a criminal defendant jury trial waiver] (*Sivongxxay*); *People v. Jones* (2018) 26 Cal.App.5th 420, 429 [reversing criminal convictions because trial court did not take steps to ensure the defendant understood what the jury trial right entails]; *People v. Blancett* (2017) 15 Cal.App.5th 1200, 1206 [invalid waiver in OHMD proceeding where the trial court did not explain the right to a jury trial, counsel had been appointed "moments before [defendant] entered his waiver," and "the record [did] not suggest that [defendant] was familiar with [OHMD] proceedings"].)

Accordingly, we join the Fifth and Sixth Districts in holding that counsel may validly waive a proposed conservatee's right to a jury trial in LPS proceedings "absent circumstances suggesting the proposed conservatee's counsel lacked actual authority, counsel disregarded his client's wishes, or that the proposed conservatee was actually unaware of his right to a trial by jury." (*C.O.*, *supra*, 71 Cal.App.5th at p. 911; see *John L.*, *supra*, 48 Cal.4th at p. 149.)

## C. Substantial Evidence Support Trial Court's Implied Finding that C.O.'s Jury Trial Waiver Through Counsel Was Knowing, Intelligent, and Voluntary

In the instant case,[7] C.O. was present in the courtroom at the July hearing when the public defender stated that C.O. was "requesting a court

---

[7] We deny the Public Guardian's motion to augment the record or, in the alternative, request to take judicial notice of a reporter's transcript from C.O.'s prior conservatorship proceeding on the basis that it is unnecessary to our determination.

14

trial." C.O. affirmed on the record that the public defender had "discussed [her] rights to have a jury or judge trial." The public defender then asked C.O. on the record to confirm that she wanted a "judge trial" and she did. Moreover, the public defender explicitly referenced a previous discussion regarding C.O.'s jury trial right before asking her to confirm her wish to waive the right. C.O. fully participated in her court trial without objection, including testifying as a witness. We further observe that C.O. received a citation for conservatorship a month before the July hearing, which stated, "You have the right to a jury trial if you wish."

The record refutes C.O.'s contention that the public defender did not waive her right to a trial by jury, and it affirmatively supports the trial court's implied finding that C.O.'s waiver through the public defender was knowing, intelligent and voluntary. In the absence of any contrary indication, we presume that the public defender provided competent representation (*Cannon*, *supra*, 18 Cal.5th at p. 524) and therefore "fully communicat[ed] with [C.O.] about the entire proceeding" including her statutory rights and waiver. (*Mary K., supra,* 234 Cal.App.3d at p. 272.) C.O. does not contend that she received deficient assistance of counsel. Nor is there any evidence on the record suggesting that C.O. was unaware of her right to a jury trial or that the public defender disregarded her wish to have a jury trial.

C.O. maintains that she "initially said she did not know if she was going to waive jury." We are skeptical that is a reasonable reading of what transpired.[8] But even assuming that C.O. was "initially" unsure whether she

---

[8] After the public defender stated that C.O. was "requesting a court trial and then we discussed doing that in about 60 days" and asked C.O. to confirm that was what she "still want[ed] to do," C.O. did not express apprehension about proceeding with a court trial. Instead, she was initially

wanted to waive her jury trial right, that would not evidence that her subsequent waiver on the record was unknowing or unintelligent. C.O. does not allege that her waiver was involuntary.

In view of the citation mailed to C.O. that stated her right to a trial by jury, the evidence that the public defender informed C.O. of her right to a jury trial, C.O.'s presence at the hearing when the public defender stated that she wanted a "court trial," and C.O.'s on the record communication with the public defender about how she wished to proceed, there is substantial evidence supporting the trial court's implied finding that C.O.'s waiver was knowing, intelligent, and voluntary.

## D.    Trial Court's Failure to Advise C.O. About Her Right to Jury Trial Was Harmless

The trial transcript establishes, and the Public Guardian does not contest, C.O.'s claim that the trial court failed to advise C.O. of her jury trial right on the record. The LPS Act expressly incorporates Probate Code section 1828's advisement requirement for establishing a conservatorship. (§ 5350.) Nothing in section 5350 addresses or contravenes that procedure. (See *C.O.*, *supra*, 71 Cal.App.5th at pp. 908–909.) Accordingly, based on the plain language of section 5350 and Probate Code section 1828, subdivision (a)(6), the trial court's failure to advise C.O. of her right to a jury trial over the matter of the establishment of the conservatorship was statutory error.

We apply harmless error analysis to such a statutory error. (See *C.O.*, *supra*, 71 Cal.App.5th pp. 918–919; see also *Sivongxxay*, *supra*, 3 Cal.5th at pp. 180–183 [inadequate waiver of right to a jury trial under state law subject to harmless error].) In this assessment, we review "the record to ascertain whether it reveals a reasonable probability that the defendant would have

---

"not quite sure" about her counsel's proposal to wait 60 days for her trial. She did not hesitate when asked to affirm her "wish to have a judge trial."

opted for a jury trial" had no advisement error occurred. (*Sivongxxay*, at p. 187.) "Under this standard, 'the appellant bears the burden to make an 'affirmative showing' the trial court committed error that resulted in a miscarriage of justice.' " (*C.O.*, at p. 919.)

C.O. has not shown that there is a reasonable probability that, had the trial court properly advised her of her jury trial right, she would have refused to enter a jury waiver and instead would have sought a jury trial. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 187.) "We also see nothing in the record suggesting that C.O. would have elected a jury trial over a court trial if the trial court had advised [her] personally at the court proceeding of [her] right to the former." (*C.O.*, *supra*, 71 Cal.App.5th at p. 919.)

Thus, in light of C.O.'s knowing and intelligent waiver of her jury trial right, we find the trial court's statutory error in failing to advise C.O. on the record of her right to a jury trial harmless. (See *C.O.*, *supra*, 71 Cal.App.5th pp. 918–919 [error was harmless because proposed conservatee's jury trial waiver was knowing and voluntary]; cf. *K.R. v. Superior Court* (2022) 80 Cal.App.5th 133, 144 [harmless error inapplicable because "the record contain[ed] no indication that [conservatee's] counsel purported to waive [conservatee's] jury trial right"].)

## II.

## Grave Disability

C.O. argues that there was insufficient evidence in support of the trial court's grave disability finding. Specifically, she contends that Dr. Bravo lacked sufficient current information about her and that his opinion "lacked sufficient detail." We disagree.

"We review the whole record in favor of the judgment below to determine whether there was substantial evidence [the proposed conservatee]

17

was gravely disabled beyond a reasonable doubt." (*Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 54 (*S.A.*).) In doing so, "[w]e must resolve all conflicts in the evidence and draw all reasonable inferences in favor of the findings." (*Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 347–348.) "Substantial evidence includes circumstantial evidence and reasonable inferences flowing from it." (*S.A.*, at p. 54.)

Grave disability must be proven beyond a reasonable doubt. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 229–230.) A person is " '[g]ravely disabled' " if, due to a mental condition, the person "is unable to provide for their basic personal needs for food, clothing, shelter, personal safety, or necessary medical care." (§ 5008, subd. (h)(1)(A); see *id.*, subd. (p) [defining " '[p]ersonal safety' " as "the ability of one to survive safely in the community without involuntary detention or treatment"].) " 'In order to establish that a person is gravely disabled, the evidence must support an objective finding that the person, due to [a] mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter.' " (*Conservatorship of M.B.* (2018) 27 Cal.App.5th 98, 106.)

A finding of grave disability may not be based merely on a person's intellectual disability or socially disruptive behavior. (§ 5008, subd. (h)(3); *Conservatorship of Smith* (1986) 187 Cal.App.3d 903, 909.) However, a finding of grave disability is warranted if a conservatee is presently unable to provide for his or her basic needs without medication and would not take medication without the supervision of the conservator. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 (*Walker*); *Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446–447.)

18

Here, Dr. Bravo reviewed C.O.'s recent medical records and spoke to members of C.O.'s treatment team prior to testifying. Without objection, Dr. Bravo's testimony was based on C.O.'s medical records and these conversations. Dr. Bravo was entitled to "rely on hearsay including statements made by the patient or by third persons" in forming his opinion and he could testify in general terms that he did so. (*Conservatorship of Torres* (1986) 180 Cal.App.3d 1159, 1163; Evid. Code, § 801, subd. (b).)[9] Coupled with Dr. Bravo's familiarity with C.O.'s prior conservatorship evaluations, Dr. Bravo had a sufficient basis to form an opinion as to whether C.O. is presently unable to provide for her basic needs. (See also § 5008.2 ["the historical course of the person's mental disorder . . . shall be considered when it has a direct bearing on the determination of whether the person . . . is gravely disabled, as a result of a mental disorder"].)

Dr. Bravo testified that C.O. is "currently" gravely disabled because "[s]he has not shown that she can really take care of herself outside because

_____

[9] C.O. does not argue Dr. Bravo's testimony included testimony of case-specific facts, i.e., facts "relating to the particular events and participants alleged to have been involved in the case being tried," which must be properly admitted through an applicable hearsay exception. (*People v. Sanchez* (2016) 63 Cal.4th 665, 676, 684; see *Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1284 [applying *Sanchez* in LPS proceedings to testimony by Dr. Bravo].) Accordingly, we do not address whether a sound objection could have been made on this ground. (See *Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 653 ["An appellant abandons an issue by failing to raise it in the opening brief"].) However, we observe that C.O.'s medical records may have been admissible under the business records exception. (Evid. Code, § 1271; see *S.A.*, *supra*, 25 Cal.App.5th at p. 447; see also *People v. Bona* (2017) 15 Cal.App.5th 511, 522 [appellant failed to prove counsel had no legitimate tactical reason for failing to raise a *Sanchez* objection and failed to prove prejudice, in part because " 'there might have been a way that the government could have presented some of the inadmissible case-specific hearsay in an admissible fashion' "].)

of [her] symptoms," which manifest as delusions, hallucinations, erratic behavior, and paranoia. He testified that she has "no real plan" to provide for herself outside the conservatorship and "gets brought back because of her symptoms." Dr. Bravo opined that he did not believe that C.O. would remain complaint with her medications if released because she lacked insight to her mental illness and had made statements that she does not need her medications. And although her "anti-authoritarian streak" was not "necessarily" because of her mental illness, Dr. Bravo opined that it made it "harder for her to be in [a] controlled setting." It is a natural and reasonable inference that her attitude, when coupled with her mental illness and lack of insight into it, would result in her not taking her prescribed medications if released and therefore she would be unable to provide for herself.

C.O.'s testimony also supplies substantial evidence that she cannot provide for her own food, shelter, or personal safety because of her mental illness. She stated that she had no access to CalFresh and her food stamps were "hacked" and that her family and the government were "stealing [her] money," indicating that her paranoia and delusions inhibited her ability to carry out the transactions necessary to her survival. C.O. also claimed without support that a housing assistance program would just "give" her an apartment and failing that she said she would buy a car to sleep in or live "on the streets." But her testimony reveals that she lacks the wherewithal to buy a car or successfully apply for public housing due to her symptoms. Specifically, she lost her social security card and did not know how to recover it, explaining that she lost her social security card when she "left [her] purse" because she needed to "go somewhere else and be away" from her "government phone." She also described giving money away to people that she "found . . . sitting on the street."

20

C.O.'s testimony also reflected a dearth of understanding about her mental illness and need for medication. When asked if she needed to take her prescribed medications, she said that she "sometimes" did; then she contradicted herself, saying that she did not think that she needs her prescribed medications because she did not know what was in them and because she "went off meds for a couple days" and she was "just fine." C.O. was also noncommittal when asked if she would remain medically compliant, replying she "probably would because sometimes it helps [her] to calm down" before complaining that she "did not have time" to be in a conservatorship.

These facts are analogous to those in *Walker*. Like Dr. Bravo, the government's expert in *Walker* opined that the conservatee was gravely disabled, lacked insight to his mental illness, would stop taking his medications if the conservatorship terminated, and "[w]ithout the medication, [the conservatee] would become agitated so that he would be unable to take care of his own physical needs." (*Walker*, *supra*, 206 Cal.App.3d at p. 1576.) Based on this expert testimony, *Walker* found the order reestablishing a conservatorship was supported by substantial evidence, notwithstanding the conservatee's "statement that he had taken [his] medicine before." (*Id.* at p. 1577; see also *Conservatorship of Guerrero*, *supra*, 69 Cal.App.4th at pp. 446–447 [finding of grave disability sufficiently supported by psychiatric testimony that conservatee will not take medication without supervision and cannot care for himself but for medication].)

C.O.'s authorities are inapposite because Dr. Bravo did not testify that C.O. was presently able to provide her own basic needs but would be unable to if released because she would not take her medication. (E.g., *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030, 1033 [conservatee was presently able to provide for food, clothing, and shelter, but given

21

propensity to not take medication, would likely "regress and become gravely disabled in a fairly short period of time" if released]; *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15, 17–18 [conservatee was presently capable of managing his own affairs, but if released would likely relapse into alcohol abuse and become gravely disabled in the future]; *Conservatorship of Smith*, *supra*, 187 Cal.App.3d 903, 907 [psychiatrist testified that conservatee's mental disorder "caused behavior which brought her into conflict with the community," but the psychiatrist also testified that conservatee could feed and clothe herself and provide for her own place to live].)

We are not persuaded by C.O.'s argument that Dr. Bravo's opinion that C.O. has a grave disability was premised merely on C.O.'s decision to leave Arrowood or his opinion that she has an "anti-authoritarian streak." Nor are we persuaded that the trial court imposed the conservatorship merely because it stated that it wanted to see C.O. have more stability and reproved C.O.'s smoking habit. Rather, by testifying that she left Arrowood in the middle of the night to buy cigarettes because she needed to stay up to avoid being "prey[ed]" on in her sleep, that she left her purse and valuables to get away from her "government" phone, that she gave money to people for unclear purposes and lacked access to CalFresh or her social security income, all while she searched for her mom "in heaven" during her two days unsupervised, C.O. demonstrated that she was unable to survive safely in the community without treatment. Viewing the whole record in favor of the judgment, the testimony of Dr. Bravo and C.O. provide reasonable and solid evidence from which a reasonable trier of fact could find C.O. gravely disabled beyond a reasonable doubt.

22

## III.

### Special Disabilities

C.O. contends that the special disabilities imposed by the trial court were not supported by substantial evidence. We disagree.

The LPS Act specifically authorizes the trial court to designate certain "disabilities" to which a conservatee may be subject, including the right to refuse to consent to medical treatment, the right to possess firearms, and the privilege to possess a driver's license. (§ 5357, subds. (a), (d), (f).) But in the absence of a court order imposing these disabilities or an emergency, a conservatee does not suffer legal disabilities merely by being found gravely disabled. (§ 5005; *Walker*, *supra*, 206 Cal.App.3d at p. 1578; *In re Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612.) A conservatee may be incapable of providing for one or more of his or her basic needs and yet sufficiently able in other respects that imposition of one or more of the special disabilities is inappropriate. The party seeking conservatorship has the burden of producing evidence to support the disabilities sought. (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165 (*George H.*).)

A conservatee retains the right to refuse antipsychotic medication "absent a judicial determination that the individual lacks the capacity to rationally decide whether to refuse or consent to such medication (i.e., a finding of decisional incapacity) or an emergency." (*K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 170 (*K.G.*); see *In re Qawi* (2004) 32 Cal.4th 1, 19 ["the long-term LPS Act conservatee possesses the right to refuse antipsychotic medication absent a determination of incompetence"] (*Qawi*).) LPS conservatees are presumed competent to refuse antipsychotic medication. (*Qawi*, at p. 17.) Therefore, we must determine whether the record contains

23

clear and convincing evidence from which a reasonable trier of fact could have made the finding of incompetence. (*S.A.*, *supra*, 57 Cal.App.5th at p. 56.)

In considering whether a gravely disabled person is incapable of making medical treatment decisions, courts "must consider: '(a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . .; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought [citation] and otherwise participate in the treatment decision by means of rational thought processes.'" (*K.G.*, *supra*, 204 Cal.App.4th at p. 180, quoting *Qawi*, *supra*, 32 Cal.4th at p. 18.) "[T]here is no clear statutory requirement that the court make an express finding of decisional incapacity before imposing the medical treatment disabilities. [Citations.] However, the record must disclose that the trial court was aware of the finding it was required to make before imposing the disabilities, that it considered the evidence proffered on the issue, and that it in fact made the finding." (*K.G.*, at p. 179.)

Here, the record indicates that the trial court was aware that it had to make an appropriate finding beyond the existence of a grave disability before imposing special disabilities on C.O. After it found that C.O. suffered a grave disability, the court specified and imposed each of the disabilities that the Public Guardian requested. Even though the court did not make express findings as to C.O.'s decisional incapacity or whether C.O. would be a danger to others if she possessed a firearm, we " 'presume in favor of the judgment

every finding of fact necessary to support it warranted by the evidence.' " (*George H.*, *supra*, 169 Cal.App.4th at p. 165.)

Substantial evidence supported the trial court's implied finding of high probability that C.O. lacked decisional capacity relating to psychotropic treatment. In accordance with the practice laid out in *Walker*, the Public Guardian "disclose[d], by the questions asked [and] the argument made, the evidence relied upon to support special disabilities under section 5357." (*Walker*, *supra*, 206 Cal.App.3d at p. 1578.) Based on C.O.'s statements, Dr. Bravo opined that C.O. "doesn't really think she has a psychiatric diagnosis, that there's nothing wrong with her, and that she doesn't need the meds." He then opined that she is neither "willing, or able to accept a meaningful treatment at this time" and therefore she should be denied the right to consent to or refuse treatment related to her grave disability.

C.O. misreads *George H.*, *supra*, 169 Cal.App.4th at page 166 for the proposition that her right to refuse psychotropic treatment may be stripped only if there is evidence that she is not compliant with her medication. That may be sufficient evidence, but she fails to cite authority stating it is necessary. Even assuming it was, the trial court was entitled to draw inferences relevant to the special disabilities from general evidence about C.O.'s condition. (*Conservatorship of Amanda B.*, *supra*, 149 Cal.App.4th at pp. 347–348; see also *S.A.*, *supra*, 57 Cal.App.5th at p. 56 ["We do not reweigh evidence"].) After all the evidence had been presented, including C.O.'s equivocal testimony about whether her need for medications and whether she would continue to take them, the court "had questions about whether [C.O.] would continue to take medications." Thus, substantial evidence supports the court's implied finding that C.O. would not voluntarily take her medications for treatment.

Substantial evidence also supports the trial court's decision to impose disabilities limiting C.O.'s privilege to possess a license to operate a motor vehicle and her right to possess a firearm or deadly weapon. (§ 5357, subds. (a), (f).) Dr. Bravo's testimony that C.O. suffers delusions, paranoia, and hallucinations, and C.O.'s testimony exhibiting delusional and conspiratorial thinking, supports the court's implied finding that possession of a firearm or any other deadly weapon by C.O. would present a danger to the safety of the person or to others. (§ 8103, subd. (e)(1), see § 5357, subd. f).) It also supports the implied finding that C.O. could not safely operate a motor vehicle because of her delusions and hallucinations. (See *George H.*, *supra*, 169 Cal.App.4th at p. 166.) Moreover, Dr. Bravo testified that that "[C.O.'s] mental illness affect[s] her ability to exercise reasonable control in operating a motor vehicle" and "in operating a firearm, or other deadly weapon." C.O. fails to cite any authority that such disabilities must be premised on specific instances of the conservatee's erratic behavior or dangerous driving.

## IV.

## Least Restrictive Placement

C.O. argues that the trial court abused its discretion by placing her in a locked facility because a less restrictive placement was viable. We disagree.

When a trial court concludes that a conservatee is gravely disabled, the court must initially decide "the least restrictive alternative placement" for them. (§ 5358, subd. (a)(1)(A).) For a conservatee found gravely disabled who is not placed at home, "first priority shall be to placement in a suitable facility as close as possible to his or her home or the home of a relative," whereby "suitable facility means the least restrictive residential placement available and necessary to achieve the purpose of treatment." (*Id.*, subd.

26

(c)(1).)  In making this assessment, the court shall consider the report of the officer providing conservatorship investigation.  (*Ibid.*)

Given C.O.'s repeated history of absconding from her placements, substantial evidence supports the trial court's determination that the least restrictive placement was a locked facility.  C.O.'s contention otherwise is self-refuting.  As C.O. points out, "[she] was in a board and care home when the incident where she left to get cigarettes occurred" and "Dr. Bravo even agreed that [C.O.] would probably be off conservatorship today if not for that incident."  Accordingly, the court was on solid footing in determining that placement at a board and care facility would not achieve the purpose of treatment.  C.O. does not argue that the court failed to consider all the relevant evidence or the report of the officer providing conservatorship investigation as provided by section 5358, and therefore the court did not abuse its discretion in designating a locked facility as the least restrictive placement.

## DISPOSITION

The judgment is affirmed.

_____
Sweet, J.*


WE CONCUR:


_____
Brown, P. J.


_____
Streeter, J.


A174646/*Conservatorship of the Person C.O.*

---

* Judge of the Superior Court of California, County of Marin, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28

_**Conservatorship of the Person C.O.**_ **(**A174646**)**

Trial Court:       County of Sonoma

Trial Judge:      Hon. Dana Simonds

Attorneys:

      Joshua Ashbrook Myers, Sonoma County Counsel, Francine Sharmalee Rajakumaran, Deputy County Counsel of Sonoma County for Petitioner and Respondent.

      Brandi Law Firm, Brian James Malloy for Objector and Appellant.